O’Neall, J.
delivered the opinion of the Court.
In this case, a deep respect for the ancient people of whom the defendant is one, and a full concurrence in the merited eulogium, bestowed on them in the course of the argument, for their consistency, honesty, industry, and thrift, induced a fuller consideration than the intrinsic difficulties of the case demanded.
I admire the devotion with which the remnant of Israel, scattered among us, and ah the other civilized nations of the earth, have cherished and kept their Sabbath, the 7th day of the week! Well has one of their own gifted and liberal writers said of it, using the words of inspiration, it was given “ for all generations,” “ for a perpetual covenant as a sign between the Lord and the children of Israel forever,” (Exod. 31, 16,) “ and to be wholly independent of times and places.” Mendelsohn’s Jerusalem, 203. No doubt it is as he affirms, binding upon those who believed in the law alone ; while Christians are not called upon, as he freely admits, to its observance. Mendelsohn’s Jerusalem, 209. The Lord’s day, the day of the Resurrection, is to us, who are called Christians, the day of rest after finishing a new creation. It is the day of the first visible triumph over death, hell and the grave ! It was the birth day of the believer in Christ, to whom and through whom it opened up the way which, by repentance and faith, leads unto everlasting life and eternal happiness ! On that day we rest, and to us it is the Sabbath of the Lord — its decent observance, in a Christian community, is that which ought to be expected.
It is not perhaps necessary, to the purposes of this case, to rule and hold that the Christian religion is part of the common law of South Carolina ! Still it may be useful to show that it lies at the foundation of even the Article of the Constitution under consideration, and that upon it rest many of the principles and usages, constantly acknowledged and enforced, in the Courts of justice !
The i S. of the 8th Article of the Constitution of this *522 State, declares that !i the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever hereafter be allowed, within this State, to all mankind ; provided that the •liberty of conscience, thereby declared, shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this State.”
What gave to us this noble safeguard of religious toleration, which made the worship of our common Father as free and easy as the air we breathe, and his temple as wide, capacious, and lofty as the sky he has spread above our heads ? It was not that spirit of infidelity, which deiñed reason, denied God and was stained with more blood than ever flowed upon the altars of the Aztec Idols! It was Christianity robed in light, and descending as the dove upon our ancestors, which gave us this provision ! It was that same spirit which, when the war of the revolution was about to commence, sanctified a fast, and prostrated a nation before the Lord of Hosts, to ask his blessing and assistance ! It was that same glorious spirit of mercy and love, which proclaimed the birth of the Saviour, and as its consequence, “ peace, good will towards men.” It was that same Christianity, which sought its promulgators among the humblest of the Jews, and taught them, “ love your enemies, bless them that curse you, do good to them which hate you, and pray for them which despitefully use you and persecute you.” But this toleration, thus granted, is a religious toleration; it is the free exercise and enjoyment. of religious profession and worship, with two provisos, one of which, that which guards against acts of licentiousness, testifies to the Christian construction, which this section should receive J What are acts “ of licentiousness” within the meaning of this section ? Must they not be such public Acts, as are calculated to shock the moral sense of the community, where they take place ? The orgies of Bacchus, among the ancients, were not offensive ! At a later day, the Carnivals of Venice went off without note or observation. Such could not be allowed now ! Why ? Public opinion, based on Christian morality, would *523 not suffer it! Here, in this city, an open play house or Circus, on Sunday, could not exist for a day! Why ? Your streets on Sunday, answer the question! Your people love “ the house of God” more than the “ tents of wickedness.”
These hints are enoug-h to show the spirit which breathes in the Constitution. But the law which we are called upon to administer, will be found to come to ns imbued and blessed with the same holy influence. Crimes are classed into mala in se and mala prohibita. What gives them that character ? We cannot answer, as the Israelite would do, by pointing to Mount Sinai, and saying, the Lord God commanded' us, saying “thou shalt not kill,’7 “ thou shalt not steal.”
The authority of these divine precepts comes to us through Christianity; wo are “ the wild olive tree grafted,” In place of the broken branches of the original tree, Israel; and hence the law delivered at Mount Sinai, maybe by us appealed toas pointing out that which is “ evil in itself.”
Again, our law declares all contracts contra bonos mores, as illegal and void. What constitutes the standard of good morals? Is it not Christianity? There certainly is none other. Say that cannot be appealed to, and I don’t know what would be good morals. The day of moral virtue in which we live would, in an instant, if that standard were abolished, lapse into the dark and murky night of Pagan immorality. • In this State, the marriage tie is indissoluble — whence do we take that maxim? It is from the teaching of the New Testament alone.
In the Courts over which we preside, we daily acknowledge Christianity as the most solemn part of our administration. A Christian witness, having no religious scruples against placing his hand upon the book, is sworn upon the holy Evangelists — the books of the New Testament, which testify of our Saviour’s birth, life, death, and resurrection; this is so common a matter, that it is little thought of as an evidence of the part which Christianity has in the common law.
*524 All blasphemous publications, carrying upon their lace that irreverent rejection of God and his holy religion, which makes them dangerous to the community, have always been held to be libels, and punishable at common law.'— Here they would also be plain acts of licentiousness, having no warrant of protection whatsoever in our Constitution. This, however, never could extend to free and manly discussion on these holy subjects. For I agree with Mr. Jefferson, in his notes on Virginia, 235, “ our rulers can have authority over such natural rights only as we have submitted to them. The rights of conscience we never submitted, we never could submit. We are answerable for them to our God.” But I should hesitate long in pushing the argument as far as he does, by saying, as he does, that “in its exercise, it does me no injury for my neighbor to say there are twenty Gods, or no God.” While the argument rests only in words, it would be so evanescent that it might be no injury. But when it 'comes to be put in print, to be read, like Paine’s Age of Reason, by the young and the unwary, where is the parent who would say, “ it does me no injury ?” I agree fully to what is beautifully and appropriately said in Updegraph v. The Commonwealth, 11 Sergt. Maule, 394 — Christianity, general Christianity, is, and always has been, a part of the common law: “ not Christianity founded on any particular religious tenets; not Christianity with an. established church, and tithes and spiritual Courts ; but Christianity with liberty of conscience to all men.”
But I have said all which need be said on this interesting subject. It was not necessary for the decision of this case; it has only been said, to prevent silence from being interpreted into a want of confidence in the proposition, that Christianity maybe justly appealed to as part of our common law.
The case before us presents the very simple question, is a law, punishing the sale of goods on the Lord’s day, Sunday, a violation of the 1st § of the 8th Article of our Constitution, herein before cited and set out. To satisfactorily answer this question, it would be, perhaps, well to ascertain *525 what was the sense in which the framers of the Constitution used the words, “ the free exercise and enjoyment of religions profession and worship, without discrimination or preference.” Reading over the words, one would say, the venerable men who framed that article meant to say, that a man might be of any order of religious worshippers, or of none at all; that he might worship God, or not, as he pleased ; that his worship might be in any form, at any time or place, or none at all; and that for these differences in faith or practice, no difference in civil condition should ever be made by law. ' It was an abolition of all disabilities — the Christian, Israelite, Mahometan, Pagan and Infidel, all stand alike, in the Government and people of S. Carolina. To ascertain, however, more precisely the sense, we may appeal to various other sources. To the 1st Article of the amendments of the Constitution of the United States, we may very well refer to ascertain the then acknowledged sense : “ Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.” This was the general law for all the Union, as standing under the legislation of Congress. Theie could be no union of Church and State ; no religion established by law ; nor could there be any law prohibiting any man from worship-ping God, as he pleased. These plainly pointed to the evils from which we had escaped, in our separation from England. The Church of England, as an established State religion, had been felt as a great grievance, in at least one of the States of the Union. Against it, had been poured the mighty torrent of Henry’s resistless eloquence, when “ he pleaded agaiust the Parsons’ cause.” All had felt the pains and penalties imposed by English enactments, on all who sought to worship as conscience, not law, dictated. These evils were forever removed, by the amendment above referred to. In the same sense, our Constitution was adopted. This may be further illustrated by reading the draught oí the Virginia bill of Rights in ’76. The 16th Article of the first draught by Geo. Mason, will be found in Niles’s collection, called the Principles and Acts of the Revolution, 124. It declares that religion, or the *526 duty which we owe to our creator, and the manner of discharging it, can be directed only by reason and conviction, not by form or violence, and that therefore, all men should enjoy the fullest toleration in the exercise of religion, according to the dictates of conscience, unpunished and unrestrained by the magistrate, unless, under color of religion, any man disturb the peace, the happiness, or the safety of society, “And that it is the mutual duty of all to practice Christian forbearance, love and charity toiuards each other?' The proviso is very much like that in our own Constitution, and its closing declaration of duty shows how much these constitutional principles of toleration rested on Christianity. The general definition of toleration, embraced in it, is but an amplification of the words of our Constitution, which were very probably condensed from it. Again, William Livingston, Governor of New Jersey, in ’78, (See Niles’s Acts and Principles of the Revolution, 306.) gives a definition of religion: “By religion I mean,” he says, “an habitual reverence for, and devotedness to the Deity, with such, external homage, public or private, as the wor-shipper believes most acceptable to him." “According to this,” he says, “it is impossible for human laws to regulate religion, without destroying it.” It was to secure this privilege of worship, as he has beautifully described it, and this alone, that our Constitutional provision was adopted. The sense in which the fathers of liberty used the words “the free exercise and enjoyment of religious profession and worship, without discrimination or preference,” has, I think, been sufficiently shown. What abridgment of religious profession and worship is to be found in a law forbidding a shop to be kept open, or goods to be sold, on Sunday? I confess I can see none ; if there were any, I presume it will be readily admitted it hardly would have escaped the experienced eye of Dr. Cooper. Yet in his notes to 2d Stat. 707, speaking of this very article of the Constitution, he says : “This does not interfere with the right of the Legislature to incorporate religious societies for civil purposes, nor with the right of appointing a Sabbath, or day of rest from labor, as a municipal institution, conducive to *527 <civil expedience.” The legislation objected to, on this occasion, is no more than what he allowed to be proper and legitimate. It is simply an Ordinance for the better observance of the Lord’s day, as a day of rest; it simply requires a cessation of public employment, in the way of trade or business.
But it is said this violates the free exercise and enjoyment of the religious profession and worship of the Israelite. Why 1 It does not require him to desecrate his own Sabbath. It does not say, you must worship God on the Christian Sabbath. On the contrary, it leaves him free on all these matters. His evening sacrifice and his morning worship, constituting the 7th day, he publicly and freely offers up, and there is none to make him afraid. His Sundays are spent as he pleases, so far as religion is concerned. No one dare say to him, in the circle of his own fireside, what doest thou ? None, as he walks the street, would dare say to him, turn in hither, and worship as we do !
It is however fancied that in some way this law is in derogation of the Hebrew’s religion, inasmuch as by his faith and this Statute, he is compelled to keep two Sabbaths. There is the mistake. He has his own, free and undiminished! Sunday is to us our day of rest. We say to him, simply, respect us, by ceasing on this day from the pursuit of that trade and business in which you, by the security and protection given to you by our laws, make great gain. This is a mere police or municipal regulation. If the Israelite were allowed to make the objection that he would not be constitutionally restrained from .pursuing a public business on Sunday, the Infidel would say, as Duke said — -“all days are alike to me, and therefore I will at all times pursue my business.” Such an assumption is so preposterous, that no one would tolerate it. Yet, in the case of the Town Council v. C. O. Duke and Alexander Marks, the Infidel and the Israelite placed themselves on the same platform, the 1st section of 8th article of the Constitution. It is true, the alliance was altogether unnatural. Still, both together invoked the decision of that good man and good Judge, the late Judge Martin, on the very *528 question now before us — and he, with his accustomed clearness and power, decided that the Constitution did not prevent the passage of an ■ ordinance to prevent shop-keepers from keeping their shops open on the Sabbath day, and from that decision the parties dared not further pursue their complaint by appeal. It was feared that, like its noble, gifted author, it was no more; but I rejoice to find it has been preserved, and I hope, with this opinion, aiid as one of its main pillars of support, it will be given to the world.*
If it were true that the commandment to keep the Sabbath day holy also required the Israelite to work six days, as closely and faithfully as he is to observe the 7th day as a day of rest, then indeed there might be a ground to say that the ordinance which requires him to desist, during Sunday, from a public business, the sale of goods, was unconstitutional. Let us read the commandment, beginning Bxod. xx. 8, “Remember the Sabbath day, to keep it holy. Six days shalt thou labor, and do all thy work, but the seventh day is the Sabbath of the Lord thy God; in it thou shalt not do any work, thou, nor thy son, nor thy daughter, thy man servant, nor thy maid servant, nor thy cattle, nor the stranger that is within thy gates. For in six days the Lord made heaven and earth, the sea and all that in them is, and rested the seventh day: wherefore the Lord blessed the seventh day, and hallowed it.” In Deuteronomy, chap. 5, beginning at the 12th verse, we have the same commandment again set before Israel:. “Keep the Sabbath day to sanctify it, as the Lord thy God hath commanded thee. Six days thou shalt labor, and do all thy work, but the seventh day is the Sabbath of the Lord thy God ; in it thou shalt not do any work, thou, nor thy son, nor thy daughter, nor thy man servant, nor thy maid servant, nor thine ox, nor thine ass, nor any of thy cattle, nor thy stranger that is within thy gates; that thy man servant and thy maid servant may rest as well as thou. And remember that thou wast a servant in the land of Egypt, and the Lord thy God brought thee out thence, through a mighty hand and by a stretched out arm: therefore the Lord thy God commanded thee to keep the Sabbath day.” Leviticus, 23 and 3, contains, as I conceive, the commentary of the inspired Law Giver on, and the explanation of, this command. “ Six days shall work be done; but the seventh day is the Sabbath of rest., an holy convocation; ye shall do no work therein ; it is the Sabbath of the Lord in all your dwellings.” The meaning of the commandment is so plain, that I almost fear to add *529 any explanation of my own. In six days, tbe Israelite is to do the work he may have to do: on the seventh he must not work — it is his day of rest. No one ever supposed it could go further. I fancy few among Israel worked every day in the six. If such had been the commandment, it would have been hard indeed. But it was intended to set apart a day of rest, and not to give a command to labor. The Savior said, “The Sabbath was made for man, and not man for the Sabbath.” So it remains, and so it is intended ever to remain-one day out of seven, as a day of rest — and as such, it is essential to every one who labors, be it man or beast, and hence its institution and observance. There is therefore no violation of the Hebrew’s religion, in requiring him to cease from labor on another day than his Sabbath, if ho be left free to observe the latter according to his religion. It is the seventh day which is to him a holiday, made so by his religion, and to be observed, at his peril. All other days are to him indifferent. Hence he can find no abridgment of his religion in being compelled to abstain from public trade, employment, or business on one of them.
If the Legislature, or the city of Charleston, were to declare that all shops, within the State or city, should be closed, and that no one should sell or offer to sell any goods, wares, or merchandize, $n the 4th of July or 8th January, in each year, would any one believe such a law was unconstitutional 1 It could not be pretended religion had anything to do with that! What has religion to do with a similar regulation for Sunday 1 It is, in a political and social point of view, a mere day of rest. Its observance, as such, is a mere question of expediency.— But, says the argument on the other side, we would not object to it if it did not give a Christian a preference over an Israelite. Where is such a provision 1 There is none such in the law. It is general, operating upon all. The Constitution, in the respect under consideration, considers all the people of "South Carolina, on whom the government is to operate, as citizens merely ; it does not divide them into Christians and Hebrews, or any other classifica- *530 tiou. If the law is according to that, there is no objection. It is true the Israelite must cease from business on Sunday; so do all others. His religion makes him also observe Saturday ! That is not the effect of our law. It is the result of his religion, and to enjoy its cherished benefits, living in a community who have appointed a different day of rest, he must give to its law obedience, so far as it demands cessation from public employment.
The motion to reverse the decision below, is granted.
Richardson, J. Evans, J. Frost, J. Johnston, Ch. Dtjnkin, Ch. Caldwell, Ch. and Dargan, Ch. concurred.
Withers, J. did not hear the case.

 It will bo found at the end of this case.

 Opinion of Judge Martin, in the case of the Town Council of Columbia vs. C. O. Duke and Alexander Marks, for keeping their shop doors open on the Sabbath.
Ex-Parte C. O. Duke and Alexander Marks.
Martin, J.
The relators have brought their applications before me, for prohibitions, in a very informal way, and had counsel been concerned, I should, in all probability, have refused to consider them until made more technical, or more in harmony with established forms. But as I believe I understand the object of the parties, I do not feel at liberty to refuse a decision on them. ■
*531 On the 18th of July last, the Intendant and Wardens of Columbia passed an Ordinance, so much of which as is complained of by the applicants is in the following words, viz:
“ That immediately after the passing of this Ordinance, if any merchant, store-keeper, grocer, shop-keeper or keeper of a porter or drinking house, or keeper of a confectionary, shall open their store for the transaction of business on Sunday, or are convicted of selling to negroes on that day within the town, shall he subject to a fine of $12 for every such offence.”
For a violation of this Ordinance the relators have been fined.— They admit they are shop-keepers, and do not deny that they have incurred its penalties by opening their doors and selling on Sunday, if the Ordinance be Constitutional. But they insist that the Council have no authority to pass such an Ordinance, but are positively prohibited by that amendment of the Constitution of the United States, which ordains that “ Congress shall make no law respecting the establishment of religion or prohibiting the free exercise thereof,” as well as by the first section of the 8th article of the Constitution of this State, which declares that “ The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall hereafter be allowed in this State to all mankind.”
The question therefore submitted for my decision is, whether the Intendant and Wardens have the power to pass such an Ordinance. It is not controverted, that the Legislature have conferred on the corporation full power “ to make all such Ordinances, rules and regulations” and “ to establish such by-laws as may tend to preserve the quiet, peace, safety and good order of the inhabitants.” See Act of Assembly 1805, and Ordinances of the Town, page 16. But the relators, if I understand them correctly, insist either that this Ordinance goes further than is contemplated by the Act, by undertaking to enforce the religious observance of Sunday, or that .if it does not exceed the authority granted, then the Legislature itself had no power to legislate in regard to the character and duties of that day, and having none, the attempt to delegate it is void.
In examining the questions here presented, it is unnecessary to say more in relation to the inhibition contained in the Constitution of the United States, than that it is confined to the powers of Congress. The object and effect of the provision is to prevent legislation by Congress on subjects which might tend “to the establishment of religion” or interfere with the free exercise of the rights of conscience. So far, therefore, as the parties to this question are concerned, they are wholly unaffected by the Constitution of the United States. The one claims no authority under the powers of Congress, the other cannot complain that the security afforded by that article has been interrupted by those on whom alone the Constitution in this particular operates.
The relators rely, principally, on the 1st section of the 8 th article of the Constitution of this State, already quoted. The earnest *532 ness and confidence with which they have insisted that they are protected by the Constitutional provision, have induced mo to consider it attentively. But I. am wholly unable to discover its application in this instance. It cannot be pretended that this ordinance interferes with “the free exercise and enjoyment of religious worship,” or that it makes any “ discrimination” or “ gives any preference”— or that “ all mankind” are “ not allowed” all that was intended to he secured by the Constitution. The o dinance neither exacts nor imposes any religious duty or obligation — it requires no sacrifice on the part of any one, unless closing their doors and suspending their business (of which I will speak presently) be so considered. It is general in its character, and therefore every class of citizens is embraced “without discrimination or preference.” It enjoins no profession of faith, demands no religious test, extorts no religious ceremony, confers no religious privilege or “ preference”. The error consists in supposing that this regulation of the Corporation gives a “ preference,” or makes a “ discrimination” in favor of all who conceive it to be a duty to keep this day holy; and while one of the re-lators contends that it does no violence to religion to keep open shop and soli on that day, the other, who is an Israelite, denies that it is the true Sabbath.
If obedience to our laws be left to depend not on their constitutionality, but on the opinions we may form of their authoritative character, legislation would become an idle name.
Arguments, and ingenious ones too, as numerous at least as the number of those whose interests arc affected, would be advanced to shew that very many of our Statutes are unconstitutional.
Every Act requiring the performance of a public duty, which one may fancy at war with his notions of religion, and all which restrain others in the pursuit of an honest and profitable trade, without paying a heavy license, are considered oppressive, and no argument or even suggestion is necessary to convince those who are subject to such laws, that they are unconstitutional. Yet a certain class of citizens, who refuse to serve on juries, pay their fines, and hawkers and pedlars pay a heavy license for the privilege of trading within certain limits; and it has never occurred to any one, that these laws are unconstitutional.
Now if the Ordinance in question required either of the relators to observe Sunday as a sacred day, or to conform to the notions of others as to its holy character, then it would be giving a “ preference,” or making a “ discrimination” in contravention of the Constitution. But it is manifest that the nearest approximation which this Ordinance makes to religion or religious subjects, is to be found in the probability of its securing very partially to those, who do observe that day, an undisturbed and quiet performance of what they ponceive an imperative obligation. That those who do thus worship are entitled to this protection, and that the council have authority to secure it to them, I shall not stop to illustrate.
I ain wholly at a loss to conceive how such a regulation can be *533 said to possess the character attributed to it, when it neither compels the relators nor any other to observe or perform devotional exercises on that or any other day. nor forbids nor interferes with their doing so, on any other day which their creed may suggest as more sacred. The Constitution certainly does secure to all the right to worship God when and as they may please, and none “ shall make them afraid.” But will it be seriously said, that because the corporate authorities have declared that porter houses, drinking-houses, stores, &c. shall be closed on a given day, and not opened for trade or business, that they have interfered with the religion of any one — that this is making a “ discrimination” or giving a “ preference” to any class or sect ? It may, and no doubt does seriously affect the trade or busines of individuals who think proper to pursue their ordinary occupations on that day, but it cannot bo offensive to their notions of religion, let them be what they may. Nor would such an idea have occurred, or. such an argument been used, if the operations of this Ordinance had been confined to any other day — Saturday for instance. The expediency alone of such a law would have been the subject of animadversion. Mr. Marks, one of the relators, could not have complained, because he now observes that day, and would have been placed more on an equality as to the advantages of business; and it would not have occurred to Mr. Duke that the Council had it in contemplation to give the Israelites apreference” or make any “ discrimination” in their favor over Christians. As Saturday is not observed among Christians as holy, it would have suggested itself to Mr. Duke, that this Ordinance was penal and exclusively a municipal regulation, and however he and others might have protested against the policy of such a measure, it would not have been attacked on the constitutional grounds now urged.
But I can easily suppose a case where the Council would not only be justifiable, but recreant to their duty, if they did not pass and enforce an Ordinance, where it might not only affect, but actually prevent one from exercising what he might call a religious duty, and still be justified under the Constitution. Theories in religion are so numerous, and the varieties of worship so great, that any one might well be considered rash who would undertake to define the former or number the latter. Let any of these theories be ever so wild and visionary, our laws can make no' “discrimination” in favor of, nor give any “preference” to any other over then, so long as they do not amount to “licentiousness,” or justify “practices inconsistent with the peace or safety of the State.” But one might rise up and insist that true piety is to be found in devoting six days of the week to spiritual concerns, and that they are too holy for any of the temporal concerns of life. He has a right to the enjoyment of that opinion, and no one could complain if he put his faith into practice. But if his belief extended still further, and he believed that what is now the Christian Sabbath should be devoted to rioting, drunkenness and every species of debauchery, offensive to decency and good order, *534 and destructive of the peace and harmony of society, and with a view of living up to his faith, he opened his house every Sunday morning, which, as soon as opened, is filled with slaves, free persons-of color, or other idle and dissolute persons, who immediately engage in all the scenes which I have supposed constitute his faith — will it be said that these things are to be tolerated — that he cannot be restrained, because this is his religion, and to prevent him in the exercise or enjóyment of it, would be making a “discrimination” against him or giving a “preference” to others over him ? None I believe will deny the power of the Council, if such a case were to occur. They certainly possess it as an incident belonging to all municipal authorities from whom is required a preservation of the peace, good order and decency of society, and because it is an offence against all these. Nay, more — the latter clause of that section of the constitution on which the relators rely ordains that “the liberty of conscience thereby declared, shall not be so construed as to authorise acts of licentiousness or justify practices inconsistent with the safety of the State.” It proves nothing to say that such a case is not likely to occur. Theories little less extravagant, if in no way analogous, have not wanted adherents:
I have thus far endeavored to show that the supposition that this ordinance is in violation of the constitution cannot be sustained.— As a municipal or police regulation, the ordinance would seem to be wholly unobjectionable. Men may have a natural right to do any thing which their inclinations may suggest, if it be not evil in itself, and shall in no way impair the rights of others. But when societies or governments are formed, every one surrenders certain rights, and as an equivalent for that surrender, has secured to him the enjoyment of certain other rights appertaining to his person and property, without the protection of which civilized society cannot exist.— All legislation, therefore, is a restraint on individuals, but it is a restraint which must be exercised by all who would enjoy the benefits derived from the institutions of society. The right to exercise these restraints must, of necessity, be vested in the supreme authority of the community. In this State the people are sovereign, (or at least claim to be so) and they act by their representatives assembled as a legislature under the constitution. The legislature, therefore, have the power to do all that the people themselves can do in their aggregate character, except in those instances where they find prohibitions in the constitution., That the legislature have the authority to prescribe the terms on which licenses to retailers, store keepers and all others embraced in the ordinance now under consideration, shall be granted, never has been and cannot, at this day, be seriously questioned by any one ; and it is equally clear, that if they thought it advisable and expedient, they might, by legislation, close them altogether. If, then, it be true that the legislature may make it penal to keep such establishments without a license — if it may prescribe the terms and conditions of their retailing, and even refuse all license whatever, surely it can say whenever, in their wisdom, expe- *535 dieney and. policy suggest, that they shall be closed on a given day of every week.
If society, by one consent, or by law, designate any 'day of the ■week as one of leisure and rest and on which all the ordinary and laborious occupations and pursuits of life are suspended, the recurrence of that day necessarily throws upon the community, for the time, servants, apprentices and other laborers, ready to embrace every opportunity which presents the means of indulgence. To lessen these temptations or render such as do exist as innoxious as possible, is a duty incumbent on all the municipal authorities, paramount to all considerations of the exclusive interest of any individual or class of individuals. And if it be called a restraint on individual or personal liberty in not allowing every one to pursue his own interest, as it may be presented, the answer is, it is a restraint which the benefit of society imposes, and the right to impose it has been yielded by the individual himself — or, in other words, it is one which those “in whom all power is originally vested” (among whom he is himself numbered) have prescribed for the common benefit. No member of society has the right to pursue any trade, occupation or pursuit, from which society suffers a positive injury or is exposed to imminent danger ; and it isfor those in authority to decide on the policy of prohibiting or removing such evils, when the case presented is within their jurisdiction.
The pursuit or occupation may be perfectly harmless, or but partially so, in one situation and under particular circumstances, while at another place and under a different state of thing, the evil might be so great, or the danger so obvious as to be wholly insufferable.— Take, for examples, an establishment for slaughtering all sorts of animals, or one for the manufacture of gun-powder, in the centre of a populous city and directly on a principal street, what would either of the relators say, if an establishment for either of those purposes was about to commence business next door to him ? What would the whole community say? Would any one then doubt that the corporate authorities had power to prevent them altogether, to say nothing of the power to restain their operation for one day in the week ? And yet, perhaps, there are not wanting those who believe, very conscientiously, that neither of the establishments to which I have alluded would be positively so injurious to society as one for retailing spirituous liquors every day in the week. This variety of opinion shews the absolute necessity that a right to decide, and the power to enforce their decisions, should exist somewhere else than in the opinions of those who may be personally interested, or who may be laboring under a morbid sensibility on such subject. The Legislature possesses the power from the people ; and, with it, the right and authority to delegate it to such agents as they may select. By the Act of 1805, before referred to, they have conferred on the Council (and that Council is chosen by those who are affected by their ordinances) power “to establish such by-laws as may tend to the quiet, peace, safety and good order of the inhabitants.” This grant would *536 seem to embrace all that the Council contend for, if words can convey what they insist they possess.
I entertain no doubt they do possess it, and possessing it, they are ■ to determine for themselves and the “inhabitants,” when it may be judiciously exercised. Having determined that this is a proper time, I have no control over them. The motions for prohibitions are therefore refused.
September 14, 1833.